**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RUBEN NIDZON<br><br>                 Plaintiff,<br><br>      v.<br><br>KONICA MINOLTA BUSINESS SOLUTIONS<br>USA, INC.,<br><br>                 Defendant. | Civil Action No. 07-cv- 3724 (BSJ)<br><br>ECF Case<br>Document Filed Electronically<br><br><br>**DEFENDANT'S STATEMENT OF**<br>**MATERIAL FACTS PURSUANT TO**<br>**LOCAL CIVIL RULE 56.1** |

Pursuant to Local Civil Rule 56.1, Defendant Konica Minolta Business Solutions USA, Inc. ("KMBS") makes the following statement of material facts as to which KMBS contends there is no genuine issue to be tried, in support of its Motion for Summary Judgment.

1. KMBS sells and services advanced imaging and networking technologies, including copiers, through branch offices in Manhattan and elsewhere.[1]

2. From May 3, 2004 through February 17, 2006, Plaintiff was one of approximately 84 KMBS technicians based in the Manhattan branch who spent most of their work time servicing KMBS equipment at customer locations in accordance with the terms of service contracts.[2]

3. The types of equipment technicians serviced varied.[3]

4. Plaintiff's primary responsibility was to service color copiers in accordance with KMBS policies and procedures.[4]

---

[1] Siriram Aff. ¶ 2. Cited witness affidavits, declarations, exhibits, deposition transcript pages, and the Complaint are attached to the accompanying affirmation of Laurie Holsey. Deposition transcripts are cited with the name of the deponent followed by page numbers (*e.g.*, Plaintiff 216-217). Exhibits are cited with Bates numbers if produced during discovery and in numerical order of citation in this brief, not by the exhibit numbers used at depositions.

[2] *See* Siriram 88.

[3] Siriram Aff. ¶ 2.

[4] *See* Ex. 1 Employee Change Form dated May 3, 2004 (KMBS 28); Plaintiff 321; Siriram Aff. ¶ 8.

5.      Five Field Technical Managers ("FTMs") each directly supervised 16 or so of these Manhattan technicians.[5]

6.      Each FTMs' responsibilities included, among other things, implementing and enforcing policies and procedures, scheduling training and time off, setting performance goals, evaluating technician performance in relation to these goals, visiting customers to audit equipment performance and customer satisfaction, and leading bi-weekly team meetings to discuss these and other issues.[6]

7.      The Branch Technical Manager ("BTM"), Clyde Siriram, oversaw the branch's technical operations and directly supervised the five FTMs.[7]

8.      He interacted most often with the FTMs and higher-level managers.[8]

9.      His direct supervisor was Paul Ambrose, the Regional Tech Manager for the Northeast; and Ambrose's direct supervisor was Joe Flynn, the Vice President of Technical Operations for the Eastern Division.[9]

10.     All of Manhattan was the official territory of every Manhattan technician, but two of the FTM's teams concentrated on areas west of Fifth Avenue, two concentrated on areas east of Fifth Avenue, and one concentrated on the area below Canal Street.[10]

11.     Nelson Candelario was Plaintiff's FTM from May 3, 2004 until early August of 2004; and Steven Blackwell was Plaintiff's FTM from then through February 17, 2006.[11]

12.     This switch occurred because the FTMs realigned area responsibilities.[12]

---

[5] *See* Blackwell 45-46; Candelario 13-15; Siriram Aff. ¶ 3
[6] *See* Candelario 13-15; Siriram Aff. ¶ 4.
[7] Siriram 41-42, 104; Siriram Aff. ¶ 2
[8] Siriram 104-105; Siriram Aff. ¶ 3
[9] Ambrose 6, 40; Dillon 31, 33; Ambrose Aff. ¶ 2
[10] Blackwell 154; Siriram Aff. ¶ 10.
[11] *See* Plaintiff 320; Ex. 1 Employee Change Form; Blackwell 45; Candelario 27-28; Candelario Aff. ¶12.
[12] *See* Blackwell 45; Candelario 52.

#1410959 v1
106942-59616

13.     Plaintiff's assigned customers, who were between Canal and 14th Streets west of Fifth Avenue, did not change.[13]

14.     Plaintiff and other technicians regularly performed service in multiple areas of Manhattan for customers to which they had not been assigned.[14]

15.     For example, if a technician was on vacation, in training, or otherwise not available to service an assigned customer, another technician would need to provide the service.[15]

16.     If an emergency service call came in, it could be assigned to the technician with the least priority assignments in his queue.[16]

17.     All Manhattan technicians were expected to support each other and ensure that customers were being serviced promptly and effectively.[17]

18.     Konica Business Technologies ("Konica") and Minolta Business Solutions ("Minolta") legally merged in October 2003 to form KMBS.[18]

19.     The service groups officially integrated on April 1, 2004, with integration-related activities occurring for months before and after, including a move by all Konica employees to the Minolta offices at 420 Lexington Avenue.[19]

20.     The combined Manhattan KMBS branch was very important to the new company because it was responsible for selling to and servicing the highest volume and density of customers and equipment of any KMBS branch.[20]

---

[13] Plaintiff 566, 590; Candelario Aff. ¶ 13; Siriram Aff ¶ 11.
[14] Plaintiff 590; Blackwell 155-159; Siriram Aff. ¶ 11.
[15] Siriram 129-130.
[16] *See* Siriram 130; Blackwell 151-159.
[17] *See* Siriram 129-130; Blackwell 154; Kakeh 15.
[18] Warwick 17; Siriram 41-42.
[19] Siriram 41-42; Candelario Aff. ¶ 3; Siriram Aff. ¶ 5.
[20] Ambrose Aff. ¶ 5; Candelario Aff. ¶ 6; Siriram Aff. ¶ 12.

#1410959 v1
106942-59616

21.     KMBS moved Siriram to its Manhattan branch in March of 2004 to oversee its service activities because he had excelled in this role as Konica's BTM in New Jersey and Manhattan.[21]

22.     He was known as a demanding manager who was very policy- and procedure-oriented.[22]

23.     He believed in communicating clear expectations and goals to the FTMs and, in turn, the technicians, and then frequently monitoring and evaluating performance in relation to these expectations and goals.[23]

24.     When he took over as Manhattan BTM, his "initial observations were:  there were no structure[s], there were minimal policies, employees' expectations were not being adhered to, organization was very poor ..., [t]here were no set guidelines on what people should be doing, and how they should be doing their responsibilities."[24]

25.     Accordingly, throughout the Spring and Summer of 2004 he focused on creating, communicating about, and implementing new policies and procedures that would apply uniformly to, and thus help to integrate the technicians who used to work for Konica or Minolta.[25]

26.     Group meetings were a primary way in which Siriram and his FTMs communicated the new policies and procedures to the technicians.[26]

27.     Early in the integration process, Siriram led some of these meetings, including ones on July 1st and 8th of 2004.[27]

---

[21] *See* Siriram 41-43; Ambrose Aff ¶ 4; Candelario Aff. ¶ 7; Siriram Aff. ¶13.
[22] Ambrose Aff ¶ 5; Candelario Aff. ¶ 6; Siriram Aff. ¶ 13.
[23] Id.
[24] Siriram 42-43.
[25] *See* Siriram 61-64; Siriram Aff. ¶ 14.
[26] *See* Blackwell 49-51; Siriram 43-44.
[27]*See* Siriram 17-18, 22, 43-44, 48-49, 155-156; Candelario Aff ¶ 14.

4

28.     Subsequently the FTMs addressed policies and procedures during their bi-weekly meetings with their teams.[28]

29.     On July 1, 2004 Siriram convened all the Manhattan technicians to discuss certain new policies and procedures that would apply to all of them.[29]

30.     "One of the topics [he] covered was the change in company policy from thirty-seven-and-half work hours a week to forty hours."[30]

31.     While this was not a change for former Konica technicians, it was a change for former Minolta technicians like Plaintiff.[31]

32.     Another critical change that Siriram discussed was the new territory-management system.[32]

33.     Previously a technician was required to telephone a dispatcher to orally receive his next service assignment after completing each service visit.[33]

34.     As of Tuesday, July 6, 2004, the first day after the holiday, dispatching would no longer be done by telephone.[34]

35.     Instead, personnel in a centralized KMBS call center would begin sending each technician electronic notifications of requests for service.[35]

36.     For the first time, each technician was required to manage the priority order between most of their calls and permitted — indeed, encouraged — to "buy" and respond to a service call that another technician agreed to "sell" from his queue without the necessity of

---

[28] *See* Blackwell 49; Candelario 14; Candelario Aff. ¶ 14; Siriram Aff ¶ 14
[29] Siriram 44, 155-156; Candelario Aff ¶ 15; Siriram Aff. ¶ 24.
[30] Siriram 43-44, 155-156.
[31] Plaintiff 331-32; Siriram 43-44.
[32] *See* Siriram 61-62; Siriram Aff. ¶ 24
[33] *See* Plaintiff 591-92; Siriram 145; Siriram Aff ¶ 25.
[34] Siriram Aff ¶ 24.
[35] Blackwell 151-156; Siriram Aff. ¶ 25

5

immediate manager involvement, so long as the buying technician was qualified to perform the needed service.[36]

37.     On July 8, 2004, Siriram convened Randy Kakeh, who had been Minolta's Color Team Leader, approximately eight other color technicians (including Plaintiff), and two network integrators to discuss certain new policies and procedures.[37]

38.     Siriram discussed the importance of adhering to a one-page Overview of Technician Responsibilities that was handed out and addressed some of them in more detail, such as the first one listed:  1.  Shave facial hair daily.  Beard must be kept trim and neat.

39.     And now that the new territory-management system had been in place for two days, he discussed it again, including Nos. 8-10 of the listed responsibilities.[38]

40.     Finally, Siriram emphasized during this July 8th meeting the importance of technicians billing for all services provided beyond the basic ones already paid for by the customers in their service contracts.[39]

41.     He elaborated: For example, if someone were to change a setting on their network and our machine were to stop working, it's no fault of the machine, it's the fault of the network being changed.  That, in turn, is a billable call to that customer, even though they have a service contract with us.  It's in the terms and conditions.[40]

---

[36] Ex. 2 Overview of Technician Responsibilities (KMBS 168) (this is the document handed to the color technicians during the July 8, 2004 meeting even though it lists September 30, 2004 as the last update, because this latter date was set to automatically update); Ex. 3 Territory Management, July 18, 2004 (KMBS 147-48); Plaintiff 342-343; Siriram Aff ¶ 26.

[37] Ex. 4 July 22, 2004 notes of interview with Siriram (KMBS 165-68); Siriram 17, 22.

[38] *See* Ex. 2 Overview of Technician Responsibilities; Plaintiff 331; Siriram 14-20; Siriram Aff ¶ 28.

[39] *See* Siriram 8-9; 28-29.

[40] Siriram 9.

#1410959 v1
106942-59616

42.    As planned, Siriram left the meeting following the discussion of this issue while Kakeh went into more detail regarding the Overview of Technician Responsibilities, including more on grooming.[41]

43.    Siriram communicated certain other new policies and procedures, such as the one regarding random-field audits, to the FTMs rather than the technicians.[42]

44.    Management of both Konica and Minolta would conduct field audits, in which they examined equipment and questioned customers without technicians being present, in response to a customer complaint or if a record developed of repeated service calls in a short period of time.[43]

45.    Additionally, Konica, unlike Minolta, also had managers regularly conduct field audits on a random basis.[44]

46.    In the Spring of 2004, Siriram informed his FTMs, including the three who came from Minolta, that they should start trying to conduct these random field audits.[45]

47.    By the last quarter of 2004, every Manhattan FTM was supposed to be conducting random field audits, with a typical frequency of 2-3 times per month for each technician.[46]

48.    The results of these field audits were recorded, with each technician expected to have an audit-passage rate of at least 80%.[47]

49.    These audit results began appearing on technician's annual-performance reviews in early 2005.[48]

---

[41] *See* Siriram 17-18; Siriram Aff ¶ 30.
[42] *See* Candelario Aff. ¶ 16; Siriram Aff ¶ 29.
[43] *See* Blackwell 89-92; Candelario 14-17; Siriram 125-27; Candelario Aff. ¶ 16; Siriram Aff. ¶15.
[44] *Id.*
[45] *See* Candelario Aff. ¶ 16; Siriram Aff ¶ 16.
[46] Candelario 22; Blackwell 90-92; Ex. 5, 2004 Audit Report (KMBS 472-73); Candelario Aff. ¶ 16; Siriram Aff ¶ 15.
[47] *See* Ex. 6 Field Technician Goals (KMBS 145-46); Candelario ¶ 16; Siriram Aff ¶ 16.
[48] Ex. 7, Plaintiff's 2004-2005 Review (KMBS 15-16); Plaintiff 504, 510-512.

#1410959 v1
106942-59616

50.     Around the time the technicians were given the laptops in July of 2004, Siriram and the FTMs also discussed with the technicians the new KMBS policy regarding technical training.[49]

51.     KMBS began offering all its technicians a wide array of technical-training programs, some of which could be completed through the new mykonicaminolta.com website, and some of which were live courses with instructors at designated KMBS training facilities.[50]

52.     While Konica had offered its technicians some training programs, company-provided training had been virtually unheard of at Minolta.[51]

53.     In conjunction with offering the new training, KMBS instituted a policy that, absent a need for coverage because the assigned technician was unavailable, no technician would be permitted to service newer equipment on which he had not completed available training.[52]

54.     This policy did not apply to older equipment for which KMBS was not offering training.[53]

55.     Recognizing that it would take time for technicians to be scheduled for and receive training, the policy was not enforced until the end of the year or earlier if a technician failed to take advantage of ample opportunities to complete training or his FTM became concerned about his skill set on a particular machine.[54]

---

[49] Siriram 71-72, 84-85, 87-89; Blackwell 128-130; Candelario 41-42.
[50] Plaintiff 620-21; Siriram 74-76; Blackwell 127-128; Candelario 43-44, 51; Siriram Aff. ¶ 17.
[51] Plaintiff 339-40; Candelario 46-47.
[52] Blackwell 127-28, 131; Candelario 42; *See* Ex. 8, March 15, 2005 Letter from Comstock-Tague to Nidzon (KMBS 212-214); Candelario Aff. ¶ 17; Siriram Aff. ¶18.
[53] Candelario 45.
[54] Blackwell 124-130; Siriram 71-72, 84-89; Candelario Aff. ¶ 17; Siriram Aff. ¶ 19.

#1410959 v1
106942-59616

56.     Because KMBS operated on a April 1-March 31 Fiscal Year, Siriram and his FTMS also instituted restrictions on technician vacations during March and April.[55]

57.     Blackwell announced this new policy during an October 2004 team meeting.[56]

58.     Without this policy, technicians' "tendency of not taking their time and want[ing] to use it come March/April" would "create[] a strain on the business" by leaving too few technicians to service customer needs, the result of the disruptive confluence of procrastination and KMBS's policy against vacation carryovers."[57]

59.     A similar confluence of procrastination and the pressure to meet sales goals by fiscal-year end resulted in technicians needing to install more new equipment in these two months than any other period; and the increased usage of imaging equipment caused by the tax-filing deadline and other seasonal reasons further increased technicians' servicing needs during this period.[58]

60.     A technician might still be able to take vacation in March or April, but only if he requested it early enough for days when not too many other members of his team were scheduled to be out of the field.[59]

61.     This schedule was always accessible to Plaintiff and the others on his team through the online Yahoo calendar system, which included this special annotation on every day in March of 2005:  "***See Clyde [Siriram] before vacation is approved this month**.[60]

62.     Plaintiff was initially hired by Minolta in 1988 to work as a technician out of its Totowa, New Jersey branch.  He left Minolta in September 1998, but was rehired in August 1999

---

[55] Siriram 65-69; *See* Ex. 9, March 31, 2004 Email from Bill Sacco (KMBS 7); Ex. 10, October 4, 2004 Technical Meeting Agenda (KMBS 185); Ex. 11, April 6, 2005 Notes from Interviews with Gill, Torres and Codrington (KMBS 103-106).
[56] Siriram 65-68; *See* Ex. 10, October 4, 2004 Technical Meeting Agenda.
[57] Siriram 68.  *See* Siriram 66, 69; Ex. 12, April 8, 2004 Salemo email to Nidzon (KMBS 8); Siriram Aff. ¶ 22.
[58] *See* Siriram 68-70; Siriram Aff. ¶ 20-21.
[59] *Id.*
[60] Ex. 13, Yahoo Calendar (KMBS _____); *See* Siriram 68-69; Siriram Aff. ¶ 23.

9

as a technician out of Minolta's Manhattan branch. He continued in this position through March 22, 2003.[61]

63.    Based on written annual evaluations and managers' recollections, his Minolta performance servicing equipment and interacting with customers was generally considered commendable or better.[62]

64.    However, his Minolta managers found Plaintiff to be outspoken and antagonistic about policies and procedures.[63]

65.    For example, Larry Mayo, Minolta's Director of Service to the Northeast Region from 1999 until the April 2004 integration, says that Plaintiff was "a loud, uninhibited guy who complained a lot," his "comments were often inappropriate for the workplace, and he tended to rant about company policies."[64]

66.    Ray Denti, Minolta's Manhattan Branch Service Manager during the same period, describes Plaintiff as "loud and confrontational."[65]

67.    Plaintiff's October 7, 2002 annual performance evaluation, notes "Development areas:  Needs to exhibit more restraint regarding company issues / complaints in a public environment," and rates Plaintiff's ability to "[w]ork[] well with others" under the "Team Work" category as "Satisfactory" rather than "Commendable."[66]

68.    Indeed, Plaintiff proudly admits that a "take no crap" attitude "always was there" in his work interactions, including before July of 2004:  I wouldn't take crap from people, I'll tell

---

[61] See Complaint ¶4; Plaintiff 290; Ex. 14, January 13, 2003 Rod McVeigh Memorandum (KMBS 49); Ex. 15 Management Evaluation Form (KMBS 37-38).

[62] *See* Ex. 16 Plaintiff's Evaluation Form for 9/02/99-9/02/00 (KMBS 62-63); Ex. 17 Plaintiff's Evaluation Form for 9/01/00-9/2/01 (KMBS 56-57); Ex. 18 Plaintiff's Evaluation Form for 9/2/02-9/2/03 (KMBS 53-54); Ex. 45 Plaintiff's 2001-2002 Review; Mayo Aff. ¶ 6.

[63] Mayo Aff. ¶ 6; Denti Aff. ¶7

[64] Mayo Aff. ¶ 6.

[65] Denti Aff. ¶ 7.

[66] *See* Ex. 18, Plaintiff's Evaluation Form for 9/2/02-9/2/03.

#1410959 v1
106942-59616

you that much ....  I would yell when I was yelled at in certain ways, okay.  … People start cursing and yelling at me, I would start cursing and yelling right back at them.  That's just the way I am.  … [Y]ou want to start yelling and acting like we're out in the street, then I have to -- unfortunately I have to stoop to that level.  … If they talked to me civilly, I would talk to them civilly.  If they didn't, then I would curse right back at them.  [67]

69.     In early 2003, Minolta had an opening for Parts Room Manager, and Alan Finan, the Regional Vice President, "wanted to hire someone with a technician's background because he felt that experience would make the individual better suited to facilitate the department."[68]

70.     While recognizing Plaintiff's prior issues in interactions with management, Denti recommend him for the position because he seemed to like leading rather than following, had demonstrated a "get it done attitude" servicing equipment, and would know what to order and when because of his technician experience.[69]

71.     Mayo agreed, so they promoted Plaintiff on March 23, 2003 to Branch Service Administration / Parts Room Manager.[70]

72.     Unfortunately, Plaintiff did not adapt well to his new responsibilities.[71]

73.     He failed to follow through on his promise to train hard to become more computer literate, instead delegating most or all of the important computer work in the parts room to his subordinates.[72]

74.     Additionally, he expended considerable energy telling his subordinates and many others that the managers' scheme of charging customers for used parts was a "scandal" amounting to "consumer fraud."[73]

---

[67] Plaintiff 215-19.
[68] Denti Aff. ¶ 14; Mayo Aff. ¶ 11.
[69] Denti Aff. ¶ 13; Mayo Aff. ¶ 10.
[70] Plaintiff 290; Ex. 19 Salary Payroll Action Request (KMBS 44); Denti Aff. ¶ 15; Mayo Aff. ¶ 12.
[71] *See* Ex. 15 Plaintiff's Evaluation Form for 3/23/03-3/22/04.
[72] Mayo Aff. ¶17-18.

#1410959 v1
106942-59616

75.     Candelario overheard Plaintiff say he was going to "expose the company" and write an article to The New York Times.[74]

76.     Plaintiff confronted Denti and Mayo on separate occasions, challenging them about the practice.[75]

77.     Both Denti and Mayo explained to Plaintiff that customers' service contracts permitted used parts.[76]

78.     Plaintiff's lack of focus on what his managers directed him to do and disrespect for their decision-making was reflected in his 2003-2004 annual evaluation, which emphasized that he needed to "focus on the established responsibilities and priorities of his position" and rated his overall performance at the lower end of satisfactory.[77]

79.     Soon after the merger, KMBS decided that, in light of its change to a more centralized parts system in which technicians could order parts stored outside Manhattan through their laptops, it would save money by eliminating a Manhattan parts position.[78]

80.     Plaintiff was selected for termination because of his problems in the parts room and higher salary in comparison to his clerical colleagues.[79]

81.     This is when Siriram, with Candelario present, offered Plaintiff the opportunity to save his employment by returning to a technician position with no pay reduction.[80]

82.     Although Siriram had some awareness of Plaintiff's prior issues with management, he also had:  (i) a need for experienced technicians; (ii) heard good things about Plaintiff's Minolta experience and performance servicing equipment and interacting with

---

[73] Plaintiff 292-298, 301-302; *See* Ex. 20, March 25, 2005 Email to Warwick (KMBS 388).
[74] Ex. 21, Buffing Notes (KMBS 267-70).  *See* Candelario Aff. ¶10.
[75] Denti Aff. ¶  8; Mayo Aff. ¶ 7
[76] Id.
[77] Plaintiff 305-307; *See* Ex.15.
[78] Serrano Aff. ¶ 4; Mayo Aff. ¶ 22; Siriram Aff. ¶ 25
[79] Id.
[80] *See* Ex. 4, July 22, 2004 Notes of Conversation with Siriram; Siriram Aff. ¶ 6

#1410959 v1
106942-59616

customers at Minolta; and (iii) a hope that, through his own take-no-guff style of management, Siriram could eliminate any problems respecting authority. [81]

83.     Plaintiff agreed to become a KMBS color technician effective May 3, 2004.[82]

84.     During the July 1, 2004 meeting that Siriram led with all the Manhattan technicians, some former Minolta technicians voiced frustrations about changes such as being required to work an additional 2.5 hours per week for the same pay.[83]

85.     However, Plaintiff was the angriest in his opposition to the new policies and procedures that Siriram discussed.[84]

86.     Plaintiff openly threatened to contact his attorney about the new workweek; and Candelario heard Plaintiff repeating "kill Clyde, kill Clyde" over and over loud enough for many of the attendees, but not Siriram, to hear.[85]

87.     During the July 8, 2004 meeting Siriram convened with the color technicians, Plaintiff was once again by far the most outspoken in his opposition to the new policies and procedures that were the meeting's purpose.[86]

88.     Siriram, who was discussing the grooming policy, pointed out that Plaintiff, who was not clean-shaven was in violation of the policy.[87]

89.     Plaintiff retorted, indicating his refusal to comply, saying "no, I'm not going to do that, no; I shave at night."[88]

90.     Siriram had to stop his presentation to explain to Plaintiff that it was company policy and would be strictly enforced.[89]

---

[81] Siriram 94; Siriram Aff. 7
[82] See Ex.1 , Salary Payroll Action Request Form.
[83] Siriram 43-46; Schneider Aff. ¶ 4.
[84] Siriram 46; Siriram Aff. ¶ 27.
[85] Siriram 48. Ex. 4 July 22, 2004 Notes; Candelario Aff. 15.
[86] Siriram 17-18; Kakeh 24-26; Siriram Aff. ¶ 30; See Ex. 2, Overview of Technician Responsibilities.
[87] Plaintiff 396-397; Siriram 17-18, 25; Serrano Aff. ¶ 8.
[88] Plaintiff 397; See Serrano Aff. ¶ 8.

#1410959 v1
106942-59616

91.     Plaintiff disrupted the meeting by voicing his antagonism to the policy because:  I remember they had it on a piece of paper, but I believe it didn't hold any water, because no company can make you shave unless if you work for, like, public service or something ….  I just believe really no one has the right to -- unless if I have a job where I need a seal around my face to protect me from harmful gases. [90]

92.     Plaintiff based this ill-founded belief on having "saw it on Court TV … many, many, many years ago.[91]

93.     Siriram switched gears to important billing issues, explaining that the technicians were responsible for informing the customers that they would be charged for certain tasks — there would be no more freebies.[92]

94.     Plaintiff interrupted Siriram once again voicing his opposition to the new policies and procedures, saying "I won't have any more customers if they keep ripping up the bills and make it look like I don't know what I'm doing."[93]

95.     Plaintiff continued to disrupt the meeting, complaining that management would not back-up the technicians on billing disputes.[94]

96.     When Siriram told Plaintiff that he would support him, Plaintiff muttered something to the tune of "I'll believe it when I see it."[95]

97.     At this point Plaintiff's good friend, Jimmy Serrano, chimed in, "caus[ing] subsequent trouble by saying that I had spent half a day creating a custom profile for a customer," but had not charged anything extra for the work.[96]

---

[89] *See* Siriram 19-20; Siriram Aff. ¶ 30.
[90] Plaintiff 329-30.
[91] Plaintiff 331.
[92] *See* Plaintiff 398; Siriram 8-9; Siriram Aff. ¶ 31.
[93] Plaintiff 400-401.
[94] Plaintiff 400-401; Ex. 4, July 22, 2004 Interview Notes; Siriram Aff. ¶ 31-32.
[95] Serrano Aff. ¶ 10.

#1410959 v1
106942-59616

98. In response, Siriram told Serrano that he should have charged for this work, and that Siriram "will make sure it sticks."[97]

99. Taking a cue from Serrano's comment, and sensing that the technicians doubted his word, Siriram made the very poor decision to tell a story about how he was friendly with a former Jewish Konica Sales Manager and that they made jokes about being cheap.[98]

100. Siriram said he joked with this Sales Manager about who counted was cheaper, Indians or Jews.  According to Siriram, he then said "I'm Indian" and "we count the beans the same as the Jews" because he "was trying to make the point to the entire group that [failing to back a technician's bill to a customer] will not happen with Clyde being the manager."[99]

101. Plaintiff's contemporaneous recounting by email of what Siriram said — which he reaffirmed during his deposition along with the admission that "I didn't get it word for word" — was:  "You know, I'm Indian, and we're cheaper than the Jews."[100]

102. Serrano states that he "took [the comment] to mean that [Siriram] believed in charging the customer whenever possible."[101]

103. Plaintiff also admitted that Siriram made the remark in that context, as well as that Siriram immediately prefaced it with "I want that billing, because, you know, I'm Indian …"[102]

104. Siriram states that he did not know at the time that Plaintiff was Jewish; and Plaintiff admits that he did not recall communicating this fact to Siriram.[103]

105. In the words of Plaintiff's good friend, Serrano:  I don't know if Clyde knew that Ruben was Jewish; and I don't think Clyde's comment was directed at Ruben.  Clyde's comment

---

[96] Serrano Aff. ¶ 12.
[97] Serrano Aff.  ¶ 13.
[98] Siriram 7-11, 26-29; Siriram Aff. ¶ 32.
[99] Siriram 10.  See also Siriram 7-14
[100] Ex. 22, Plaintiff's July 13, 2004 e-mail to Andrea Comstock-Tague (KMBS 207); Plaintiff 405-06.
[101] Serrano Aff.  ¶ 13; see also Lee Aff.  ¶ 6.
[102] Plaintiff 401; *see also* Plaintiff 398-400.
[103] *See* Siriram 29-31; Plaintiff 322.

#1410959 v1
106942-59616

was initiated by my comment.   Regardless, I did not think Clyde should refer to anyone's ethnicity or religion like that. [104]

106.    Several of the technicians continued to complain about confronting the customer on billing.  In response, Siriram undisputedly made reference to not being a puss or a pussy.  It is also undisputed that he made this reference in respect to having the courage to bill customers. What remains disputed is that Plaintiff claims Siriram was calling him a pussy, while Siriram claims that he was using Plaintiff, whom he believed to be a "pretty strong" individual, as an example of the opposite of a puss.[105]

107.    In light of what happened during the meeting, including Plaintiff's constant interruptions and obvious antagonism towards management's agenda to implement new policies and procedures, Siriram asked Candelario to bring Plaintiff in for a meeting to "to clear up the air … [and] discuss with Ruben what had happened earlier."[106]

108.    Although Candelario arranged with Plaintiff to hold this meeting at 3:30 p.m. that same day, Plaintiff did not show up until 4:45 p.m.[107]

109.    Before Siriram began talking: Ruben made some gestures like okay, come on, bring it on, with his hands (indicating)[,] … leaned forward basically and rolled up his sleeves to say come on, bring it on, let's talk.  Very defensive..[108]

110.    In an effort to get Plaintiff on board, Siriram described himself to Plaintiff as "basically a nice guy" who wanted to build a solid team of dedicated workers who respected the new KMBS policies and procedures.[109]

---

[104] Serrano Aff. ¶ 14.
[105] Plaintiff 398-401; Siriram 15-16.
[106] Candelario 56-60; Siriram Aff. ¶ 33
[107] Plaintiff 420-24; Candelario 55-59; *See* Ex. 4, July 22, 2004 Interview Notes; Candelario Aff. ¶ 18; Siriram Aff. ¶ 34.
[108] Candelario 58.
[109] *See* Siriram Aff. ¶ 34.

16

111.    Plaintiff admits that "I don't really recall too much of that meeting," but remembers Siriram expressing concern about his seeming attitude problem, to which Plaintiff responded, "I didn't have a bad attitude problem before we had that meeting this morning."[110]

112.    Plaintiff further recounted: That's when he was, like, oh, I'm basically a nice guy, and this and that.  I was, like, whatever, I didn't pay him no mind.  I was pissed, and rightfully so.  … I think he got a little nervous because he realized he said something stupid that could land him in a big pot of hot water, and he was just trying to cover his own butt, and that's what I believe.[111]

113.    The meeting ended when Plaintiff abruptly stood up at 5 p.m. sharp, walked out, and went home.  On his way out, Plaintiff threatened to talk to his lawyer.[112]

114.    The next day, Friday, July 9, 2004, Plaintiff, being aware of the company policy against harassment, discrimination, and retaliation and familiar with the procedure for asserting a complaint, called Human Resources and was connected to Adrienne Fuchs.[113]

115.    Fuchs took contemporaneous notes that Plaintiff agrees are accurate other than her quoting him as saying "he wanted to go after" Siriram and would "like to meet him in the park," which he described at his deposition as "[j]ust a little off" because he recollected saying "Clyde wouldn't have said that to me if we were out in the street or in the park."[114]

116.    Plaintiff also told her that he had "contacted his attorney and his attorney told him his first step was to contact Human Resources."  In addition to telling her that "Clyde made an anti-Semitic remark," he said he "was tired of being bullied by Clyde," who "bullies everyone."

---

[110]  Plaintiff 422.
[111]  Plaintiff 422-23.
[112]  Plaintiff 424; Candelario 55-59; Candelario Aff. ¶18; Siriram Aff. ¶ 35.
[113]  Plaintiff 315-317, 441-443.
[114]  Plaintiff 441-44, 451-52.

#1410959 v1
106942-59616

He added that   He also complained about Siriram "telling him to shave" and asked if Siriram "could insist that he shave."[115]

117.    Warwick reviewed Fuchs' notes and asked Andrea Comstock-Tague, who was a Senior Staffing and Employee Relations Specialist, with primary responsibility at the time for the region including the Manhattan branch, to further investigate the issues raised by Plaintiff.[116]

118.    On the morning of Monday July 12, 2004, Comstock-Tague spoke with Plaintiff and requested that he put his complaint in writing with as many specific details as possible.[117]

119.    On July 13, 2004, he sent her a brief, one-paragraph email "[b]ecause Sheldon [Gopstein, his attorney], suggested it."[118]

120.    On July 15, 2004, Comstock-Tague took detailed contemporaneous notes while discussing Plaintiff's complaint with him.[119]

121.    According to her notes, when she asked Plaintiff about a comment he made to Fuchs about Siriram being a bully, he responded: I say things back to him all the time.  He says I have an attitude.  I don't take shit from him.  I'm not going to be pushed around.  He can fire me – I have no mortgage, no wife or kids.[120]

122.    Plaintiff claims that he instead "I don't have to take that shit from Clyde," although he admits that he did tell her that Siriram can fire him, he has no mortgage, no wife or kids because, through her, he "didn't want Clyde to think that he was, he was going to sweat me, bother me like that, you know; if he was going to fire me, then fire me, you know."[121]

---

[115] Ex. 23, July 9, 2004 Fuchs Notes from telephone conversation with Plaintiff (KMBS 210).

[116] Warwick 44-47; Comstock-Tague Aff. ¶ 7.

[117] Plaintiff 454-455; Ex. 24, KMBS 209, Handwritten Note by Comstock-Tague; Comstock-Tague Aff. ¶ 7.

[118] Plaintiff 454, 460; Ex. 22 July 13, 2004, Email from Plaintiff to Comstock-Tague (KMBS 207).

[119] *See* Ex. 25, July 15, 2004 Comstock-Tague Notes of Conversation with Plaintiff (KMBS 169-70); Comstock-Tague Aff. ¶ 9.

[120] Ex. 25.

[121] Plaintiff 462.

18

123.    According to Comstock-Tagues's notes, when she asked Plaintiff whether he typically reacts to Siriram's comments, Plaintiff responded: Yes, I usually do.  He uses his power.  It would be different if I met him on the street.  He thinks he's tough.[122]

124.    At his deposition, Plaintiff's recollection was only slightly different: "My exact words was he wouldn't talk to me like that if he met me on the streets:; and "I don't recall" anything else about what he said to Comstock-Tague.[123]

125.    Comstock-Tague also noted that Plaintiff claimed Siriram was bullying and belittling "more [to] the Minolta people really," that this had been going on "[s]ince we've reported to him," and "I went from thieves and liars in the parts area to bullies and liars in the field."[124]

126.    On July 22, 2004, Comstock-Tague met with Siriram, who admitted he had said words to the effect of, as an Indian, being cheaper than the Jews.  He explained the billing discussion that led to the remark, how he prefaced it by recounting his joking about who was cheaper with a Jewish Sales Manager, and that he meant no offense.  He also explained how antagonistic and disruptive Plaintiff acted during earlier meetings, that meeting, and the meeting late that afternoon involving Candelario.[125]

127.    Warwick then consulted with Comstock-Tague about the investigation and reviewed the entire investigation file, including the email from Plaintiff and the notes from interviews with him and Siriram.  Because Siriram admitted making the comment, Warwick agreed with Comstock-Tague's recommendation that it was unnecessary for her to interview the other meeting participants.[126]

---

[122] Ex. 25.
[123]  Plaintiff 463.
[124] Ex. 25
[125] *See* Ex. 4; Siriram 99-100; Warwick 71.
[126] *See* Ex. 26 July 23, 2004 email from Comstock-Tague to Warwick (KMBS 164).

#1410959 v1
106942-59616

128.     Warwick concluded that the comment was "very inappropriate, … in very bad taste, and it's not anything that I wanted a manager to be part of."[127]

129.     Accordingly, on August 2, 2004, Warwick told Siriram all of this privately, as well as that, "he might lose his job … if it ever happened again."[128]   Warwick reiterated to Siriram in person a few weeks later that "I want you to know that you were wrong[; a]nd I'm serious, if you do that kind of thing again we are going to have a whole different type of discussion."[129]

130.     Warwick also told Siriram's direct manager, Paul Ambrose, Ambrose's direct manager, Joe Flynn, as well as the head of the entire services organization, Tom Dillon, about Siriram's very inappropriate comment.[130]

131.     All three reprimanded Siriram for his lapse in judgment.[131]

132.     On August 2, 2004, Warwick, who was in his Ramsey, New Jersey office, had Siriram meet with Plaintiff and Candelario to join Warwick and Comstock-Tague, who participated by conference call.   Once again, Comstock-Tague took detailed contemporaneous notes of the conversation.  Warwick thanked Plaintiff for bringing his complaint to their attention and reprimanded Siriram for the "inappropriate" comment.  Although Warwick acknowledged Siriram's explanation about similar joking with a Jewish Sales Manager and Siriram's professed lack of an intention to insult anyone with the comment, Warwick reiterated "that it was still wrong and … encouraged Clyde to exercise better judgment in the future."[132]

---

[127] Warwick 78-79.
[128] Warwick 78-79, 84-85.
[129] Warwick 108-09.
[130] *See* Warwick 110-13.
[131] Dillon 46-48, 101-102, 112; Ambrose 51-52; Warwick 110-114; Siriram 108-110, 116.
[132] *See* Ex. 27 August 2, 2004 Comstock-Tague Notes from Conversation with Plaintiff and Siriram (KMBS 174-175); Comstock-Tague Aff. ¶ 13; Warwick 83-91; Candelario 87-93; Siriram 113-14.

#1410959 v1
106942-59616

133.   In contrast to Comstock-Tague's detailed, contemporaneous notes, Plaintiff attempted to recollect this discussion many years later in his Complaint and at his deposition. While Plaintiff admits that Warwick addressed Siriram's comment at least to the extent of describing Siriram's explanation of the context, Plaintiff recollected that essentially nothing more was discussed than Warwick being concerned because Plaintiff told Comstock-Tague "I don't have to take this shit from Clyde," Warwick referring to Plaintiff as insubordinate, and Warwick concluding by telling both Siriram and Plaintiff to "play nice."[133]

134.   At his deposition, Plaintiff also explained his mindset towards Warwick and Siriram as people who "think that Jews shouldn't work or even live or exist in my country."[134]

135.   Based on Warwick's review of the entire investigation file and discussions with Comstock-Tague, Warwick was concerned about Plaintiff's open antagonism towards his managers and the new policies and procedures they were implementing.  According to not only those managers, but also Plaintiff's account as reported through Comstock-Tague, this antagonism extended back before Siriram's July 8th comment and Plaintiff's complaint the next day.  As a result, Warwick "felt in the best interest of the future that it was important" during the opportunity of the August 2, 2004 conference call "to let Ruben know what I had heard" and counsel him about the importance of following management directives because this "aggressive approach" of his "border[s] on insubordination" and "indicates a disregard for the authority of … management."[135]

136.   Although the new KMBS policies and procedures were applied to all similarly situated technicians, as discussed in Section II above, Plaintiff nevertheless complained

---

[133] *See* Complaint ¶ 10; Plaintiff 464-74.
[134] Plaintiff 252.
[135] *See* Ex. 27 August 2, 2004 Comstock-Tague Notes from Conversation with Plaintiff and Siriram (KMBS 174-175); Comstock-Tague Aff. ¶ 13-14; Warwick 66-68, 97-98.

#1410959 v1
106942-59616

repeatedly about them and his belief that they were being applied unfairly just to him.  For example:

  a.  Plaintiff refused to accept the new KMBS policy restricting vacation during March and April, which led to his outbursts in the first quarters of 2005 and 2006 and the related consequences discussed in Sections __ and __, below.  He refused to accept the policy simply because, for the past ten years or more that he was a Minolta employee, he had taken ski vacations at the end of March "and I should be able to take [vacations] when I see fit."  In sum, "[t]hat was what I thought, and that's how it always used to be."[136]

  b.  Plaintiff complained about managers showing up at his customers, despite the fact that field-audit results for him and other technicians were reported on their KMBS evaluation forms and audit records demonstrated that field audits were not conducted at his customer locations in 2004 and were conducted less often at his customer locations in 2005 and 2006 than for most other Manhattan technicians.[137]

  c.  Plaintiff alleged that he was "way, way behind everybody, way behind" in terms of being afforded opportunities to complete computer-based training in the office, but his training records demonstrate that virtually all these courses that he completed were during regular work hours.[138]

  d.  He also admits that he did not do online training at home because he lacked high-speed internet there and that he canceled a week of instructor-led training scheduled for January 2005 "because of personal issues at home."[139]

  e.  He ultimately completed during the week of March 28- April 1, 2005 the instructor-led course he had cancelled in January, which was also the same one he complained about being required in March of 2005 to complete in order to work on the covered machines.[140]

  f.  Plaintiff claims he "was sent way, way out of [his] territory" more frequently than the other technicians.[141]

  g.  Although KMBS assigned technicians customers within relatively concentrated areas, they were expected to regularly service other customers outside these areas.[142]

  h.  Minolta had essentially the same policy; and Plaintiff complained about it then.[143]

  i.  Plaintiff's delinquency in completing training on newer equipment contributed to him needing to travel farther for certain calls.[144]

---

[136] *Compare* discussion of KMBS vacation policy in last paragraph of Section II above *with* Plaintiff 578-79.

[137] *Compare* Plaintiff 510-14 *with* Ex. 7 Plaintiff's Evaluation Form for 4/1/4-/4-1/5 (KMBS 15-16); Ex. 5 , 2004 Audit Report; Ex. 26 2005-2006 Audit Report; Candelario 14-22; Blackwell 89-91; Siriram 125-27.

[138] *Compare* Plaintiff 341,42, 620-21 *with* Ex. ___, Plaintiff's Training Records (KMBS __-__).

[139] Plaintiff 633; *see* Ex. 29, January 3, 2005 Email from Blackwell to Ceralli (KMBS 153).

[140] *Compare* Ex. 30, Plaintiff's Training Records *with* Complaint ¶15.

[141] Plaintiff 545.

[142] Siriram 88, 129-130; Blackwell 154; Siriram Aff. ¶11.

[143] Id.

#1410959 v1
106942-59616

j.   But even so, a comparison of his service-call activity with that of Jimmy Serrano, the other color technician on Blackwell's team whom Plaintiff describes as the most similarly situated to him, suggests that Serrano traveled farther on average for his service calls than Plaintiff.[145]

k.   Under the new KMBS policy, which was the same as the old Minolta policy, each technician would receive an annual performance review around his anniversary date, which was either his original date of hire or the date he assumed a new title or position.[146]

l.   In Plaintiff's case, the effective date of his move from the Parts Room back into the field as a Customer Technician was May 3, 2004 — his anniversary date. Consistent with the KMBS policy for annual performance reviews, Blackwell met with him for his 2004-2005 Annual Review on May 15, 2005.[147]

m.   The new KMBS policy for salary reviews differed from the Minolta policy, which provided the salary review at the same time as the annual review.[148]

n.   Under the KMBS policy, each technician would receive his salary review in either July or January, based on the following criteria:  (1) if the anniversary date (as defined above) occurred three months before or three months after July, the technician would receive a salary review in July, (2) if the anniversary date occurred three months before or three months after January, the technician would receive a salary review in January.[149]

o.   At the time the new salary review policy was implemented in early 2004, Plaintiff was still working in the Parts Room.  Therefore, Plaintiff was slotted for a January 2005 salary review, based off of his March Parts Room anniversary date.[150]

p.   Plaintiff received his salary review in January, but his salary remained unchanged.[151]

q.   Plaintiff claims that in or around January 2005, he asked management why he had not had this 2004 review.[152]

r.   According to Plaintiff, Siriram responded in or around January 2005 to Plaintiff's query about a salary review with "Don't you Jews have enough money?"[153]

---

[144] Siriram 88, 129-130; Blackwell 155-57; Siriram Aff. ¶ 11.

[145] 431-32, 590.

[146] *See* Plaintiff 491; Siriram Aff. ¶9.

[147] Ex. 7 2004-2005 Technician Evaluation Form (KMBS 15-16); Blackwell 109-111.

[148] *See* Ex. 31 Salary Payroll Action Request (KMBS 33); Plaintiff 493-494.

[149] Blackwell 107.

[150] Siriram Aff. ¶ 9.

[151] Ex. 31 January 3, 2005 Employee Change Form (KMBS 22); Blackwell 106-108.

[152] Plaintiff 403, 494.

[153] Id.

#1410959 v1
106942-59616

s.  Plaintiff never reported alleged incident, despite his knowledge of the formal complaint process through Human Resources.[154]

137.   Technicians on Blackwell's teams were informed of the restriction on vacation in March and April many times.[155]

138.   Even Plaintiff admits remembering Blackwell:  raising it on a few -- usually towards the end of the year, he would start telling everybody you guys with vacations, you better use them or lose them.  He used to tell us, I don't want to hear all you guys coming to me at the time at the last week in April, that you have two weeks left and you all want your vacations.[156]

139.   Nevertheless, Plaintiff did not request vacation for the weeks of March 21st and April 25th until February 25, 2005.  When he received initial word that this request was not being granted in full, he responded by emailing Human Resources asking why his vacation was "being stolen" from him.[157]

140.   The next day, Comstock-Tague spoke with Plaintiff and Blackwell to gather additional details about his request and offered to permit Plaintiff to take smaller blocks of days off in March or carry over the week into May.  Plaintiff was not satisfied with this solution, so Comstock-Tague suggested that Plaintiff put his complaint in writing to allow Warwick to address it formally.[158]

141.   Comstock-Tague claims that Plaintiff responded by calling Warwick a "bigot," while Plaintiff contends his response was that Warwick "condones bigotry."[159]  At any rate,

---

[154] Plaintiff 495-496.
[155] *See* Ex. 11 April 6, 2005 Notes on the Conversation with Gill, Torres & Codrington (KMBS 103-106); Ex. 10 , October 2004 Meeting Agenda; *See* Ex. 13 Yahoo Calendar.
[156] Plaintiff 581-82.
[157] *See* Ex.33 , March 9, 2005 Email from Plaintiff (KMBS 129); Fuchs Aff. ¶ 5.
[158] *See* Plaintiff 580; Ex. 34, Comstock-Tague Handwritten Notes (KMBS 190-192); Comstock-Tague Aff. ¶ 16.
[159] *Compare* Ex. 34 *with* Plaintiff 604.

24

Comstock-Tague told Warwick her account and that she was "shocked" by Plaintiff's behavior.[160]

142.   On March 14, 2005, Plaintiff sent Warwick an email not only restating his position on his vacation requests, but also complaining about being told to stop working on machines until he received training[161]

143.   Comstock-Tague responded to Plaintiff's request on March 18, 2005 by letter.[162]

144.   She explained that KMBS was granting his requested week in April, but denying his requested week in March because of the elevated service-call needs and number of technicians already scheduled to be out of the office then.   Indeed, Plaintiff was one of the technicians already scheduled for instructor-led training the entire week of March 28th, so, if his March request was granted, he would have been out of the office two straight weeks that busy month.   She also explained why it was unacceptable that Plaintiff had failed to obtain the necessary training for the color machines.[163]

145.   On March 28, 2005, Blackwell informed Comstock-Tague by email about Plaintiff's response to her March 18th letter, which was to tell Blackwell:  "I caught you and that bitch in a lie."[164]

146.   When Warwick learned that Plaintiff had continued his antagonistic behavior and seemingly crossed the borderline into insubordination despite Warwick's counseling over eight months earlier, he arranged to meet Plaintiff in Connecticut on April 1, 2005, the day Plaintiff would be completing a week of instructor-led training there.   Tom Dillon joined Warwick for the

---

[160] Warwick 173; Comstock-Tague Aff. ¶ 17.
[161] *See* Ex. 35, March 14, 2005 Email from Plaintiff to Warwick; Plaintiff 611-612.
[162] Plaintiff 613-615; See Ex. 36, March 18, 2005 Letter from Comstock-Tague KMBS 212-214; See Ex.35, March 14, 2005 Email from Warwick to Comstock-Tague.
[163] *See* Ex. 36, March 18, 2005 Letter from Comstock-Tague (KMBS 178-179); Comstock-Tague Aff. ¶ 19.
[164] *See* Ex. 37 April 1, 2005 Email.

25

meeting because Warwick hoped, with Dillon present, they could "engage [Plaintiff] in a discussion that was productive going forward."[165]

147.    The first topic Warwick addressed was training, because he thought it was positive that Plaintiff had finally come in for training.[166]

148.    Unfortunately, Plaintiff did not react to that lead-in or the rest of the meeting as Warwick had hoped.  What Warwick had hoped was to "help Ruben understand that he could have a good career within KMBS, but that there were behaviors that were taking all the good things he had to offer and were more than over -- you know, kind of tipping the scales."[167]

149.    Warwick tried to engage Plaintiff regarding these behaviors, with the following results:

> a.   Warwick asked Plaintiff whether he called Comstock-Tague a bitch, but Plaintiff did not respond, and instead informed Warwick that he taped the discussion — a tape that Plaintiff now claims he subsequently destroyed.
>
> b.   Warwick asked Plaintiff whether he called him a bigot, to which Plaintiff responded "no, I said you condone bigotry."
>
> c.   Warwick asked Plaintiff whether anyone in management was truthful, and Plaintiff replied "not really."
>
> d.   Warwick asked Plaintiff whether he thought the managers all got together to conjure up a story, to which Plaintiff said yes.

150.    When Warwick asked Plaintiff about the many disruptions during team meetings, he responded, "I won't say anything more, I'll take you to court."[168]

151.    When Dillon was asked for his impression of Plaintiff after the meeting, Dillon, who had never met Plaintiff before, said that:  "My impression was a dissatisfied employee,

---

[165] Warwick 184; *see also* Warwick 144-145, 180-81.
[166] *See* Warwick 184.
[167] Warwick 181.
[168] *See*. Ex. 38, Buffing Notes (KMBS 107-12); Warwick 183, 185-87.

#1410959 v1
106942-59616

disgruntled, who had a lot of anger and no respect at all for any level of management or company policy…."[169]

152.    Dillon also remarked that Plaintiff "seemed … angry about everything" and "complained about all levels of management."[170]

153.    On April 6, 2005, McVeigh and Denise Pomposello interviewed three technicians from Blackwell's team, Mark Gill, Ray Torres and Peter Codrington, each separately, who said the following:

> a.   Gill expressed his frustration about Plaintiff's constant disruptions during team meetings, saying that he "should talk to Steve personally, rather than talking about it during a meeting."  Gill explained that Plaintiff "uses the meetings to bring his point across to [Blackwell]," and "[l]ately he has been worse, and is more vocal."  Plaintiff has also made "threatening gestures directed to the managers."  When asked about the vacation policy, Gill showed the online calendar on his laptop and explained "we can check to see what weeks we can take off or not."

> b.   Torres expressed similar concerns, saying that Plaintiff "should keep the negative things he has to say behind closed doors, not with a group of techs and a manager." Plaintiff would "yell out" during a meeting and will not stop interrupting unless his issue is resolved then and there.

> c.   Codrington commented about the vacation policy, noting that during the month of March "they will not give you off."   During his nine years of employment, Codrington always understood that March and April were the high season for copier technicians.[171]

154.    s a result of the above issues, Warwick sent Plaintiff a Letter of Final Warning on April 22, 2005.  The policy was that no prior written warning was necessary before issuing a final warning for insubordination or other "behavior that could lead to an immediate termination."  Warwick outlined multiple incidents where Plaintiff exhibited "open hostility and

---

[169] Dillon 77-78.
[170] Dillon 79.
[171] *See* Ex. 11, April 6, 2005 Notes (KMBS 103-106); McVeigh Aff. ¶ 4.

#1410959 v1
106942-59616

disrespect toward members of management" and an unwillingness to conform to reasonable KMBS polices and practices.[172]

155.    In late December of 2005, Blackwell became aware that Plaintiff had not complied with the policy to inform Blackwell when he ordered a certain type of part.  Blackwell spoke with Plaintiff about the protocol and told him that, even if Blackwell was unavailable, Plaintiff had to find a manager to approve the order before placing it in the system.  Because Plaintiff continually failed to follow this policy, Blackwell sent him a Letter of Concern on December 27, 2005.[173]

156.    During a February 6, 2006 team meeting, Blackwell gave Plaintiff a call on 38th Street because the technician assigned to the area was out on vacation.  Blackwell reported to Human Resources that Plaintiff's response was "fuck this." [174]

157.    Later in the meeting, Blackwell began addressing an "agenda topic" he had handed out, which read:  If you have any vacation time left put in your request immediately after checking the OKVACATION calendar.  There will be no vacations request (sic) for the month of APRIL.  Forward all request (sic) by email."[175]

158.    Immediately, Plaintiff became noticeably disruptive and interrupted Blackwell, saying "this is going to be a problem."  When Blackwell suggested that Plaintiff contact Human Resources if he had a problem with the policy, Plaintiff replied that he wanted to speak with Warwick's boss.  Blackwell and Serrano needed to make significant efforts to calm Plaintiff down, with Blackwell resorting to instructing him to breath.[176]

---

[172] Ex. 39, April 18, 2005 Letter of Final Warning (KMBS 89-91); Warwick 201-202, 209, 211-12; Plaintiff 640.
[173] Plaintiff 489-491, 656-660; Blackwell 226-230; See Ex. 40, December 26, 2005 Letter of Concern.
[174] See Ex. 41 February 13, 2006 Notes KMBS 241-244
[175] *See* Ex. 42, February 6, 2005 Technical Meeting Agenda (KMBS 258-259); Plaintiff 666-667.
[176] *See* Ex. 41, February 13, 2006 Notes (KMBS 241-244); Ex. 42, February 6, 2006 Email from Blackwell to Satkowski (KMBS 257); Serrano Aff. ¶ 25.

#1410959 v1
106942-59616

159.    Many of the technicians present at the meeting said it was the worst outburst they had ever seen by Plaintiff, describing it as "explosive."[177]

160.    Later that day, Blackwell emailed Ed Satkowski (who had assumed Comstock-Tague's position as the Senior Staffing Employee Relations Specialist responsible for the region including Manhattan) to report Plaintiff's actions during the team meeting.  Blackwell sought Satkowski's advice on how to proceed going forward, even inquiring as to whether he could exclude Plaintiff from future meetings.  This email triggered another investigation into Plaintiff's behavior by Warwick's team.[178]

161.    The next day, February 7, 2006, Plaintiff sent Blackwell an email formally requesting a transfer to the Totowa branch, claiming that his first verbal request had been ignored.[179]

162.    During his deposition, Blackwell explained that he did not encourage the transfer because:  Ruben was insubordinate, he was disrespectful, he was unprofessional when it came to communicating with me and the other managers, he didn't want to follow instructions when it came to him doing his job as far as additional training is concerned, and ... he wouldn't have been successful in another branch if he had left with what he had in New York City.[180]

163.    KMBS policy prohibited a transfer when an employee was on probation or had performance problems.[181]

164.    Because Plaintiff had been given a Letter of Concern at the end of December and had the other disciplinary issues, he was not eligible for a transfer at the time.[182]

---

[177] *See* Serrano Aff. ¶ 25; Alfaro Aff. ¶ 5.
[178] *See* Ex. 42, February 6, 2006 Email from Blackwell to Satkowski (KMBS 257); Warwick 224-225.
[179] Plaintiff 679-680; See Ex. 43 February 7, 2006 Email from Nidzon to Blackwell KMBS 260.
[180] Blackwell 209; *See* Blackwell 168-169.
[181] Blackwell 166-170; Warwick 219-220, 222; Ambrose 65-67.
[182] Polo 25-29; Warwick 219-220.

#1410959 v1
106942-59616

165.    In any event, Chris Polo,  the Totowa BTM, would not accept Plaintiff's transfer once he learned that Plaintiff was on probation.[183]

166.    Ed Satkowski's investigation included face-to-face interviews with Plaintiff, Blackwell, Ambrose, Mayo, and three other technicians on Blackwell's team, Peter Codrington, Derik Alfaro, and Trevor Green.[184]

167.    Based on Satkowski's investigation and the information of which Warwick was made aware during prior Human Resources involvement with Plaintiff, Warwick discussed the matter with Ambrose and Dillon.   They all agreed that Plaintiff's employment should be terminated.   Accordingly, Warwick, whose approval was necessary before any involuntary separation occurred at KMBS, notified Plaintiff he was being terminated on February 17, 2006.[185]

168.  A  KMBS  payroll  action  form  in  Plaintiff's  personnel  file  indicates "insubordination" as the reason for the termination.[186]


Dated: New York, New York
          May 22, 2009

                              **GIBBONS P.C.**
                              One Pennsylvania Plaza, 37th Floor
                              New York, New York  10119-3701
                              Telephone (212) 613-2000
                              Facsimile (212) 290-2018
                              lgesinsky@gibbonslaw.com
                              *Attorneys for Defendant Konica Minolta*
                              *Business Solutions USA, Inc.*


                              By: s/ Loren Gesinsky
                                    Loren Gesinsky

---

[183] *See* Polo 36-37; Ambrose 66-67.
[184] *See* Ex. 41, February 13, 2006 Interview Notes (KMBS 241-251); McVeigh Aff. ¶ 4
[185] *See* Warwick 224-228; Ambrose 90-95; Dillon 121-122.
[186] *See* Ex. 44, Salary Payroll Action Request (KMBS 1).

#1410959 v1
106942-59616